**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

**MARK TOIGO,**

**Plaintiff,**

**v.**

**DEPARTMENT OF HEALTH AND SENIOR SERVICES, et. al.,**

**Defendants.**

**Case No. 2:20-cv-04243-NKL**

## ORDER

In 2018, Missouri voters approved Amendment 2 to the Missouri Constitution, legalizing medical marijuana in the state and directing the Missouri Department of Health and Human Services (DHSS) to create a regulatory regime for medical marijuana facilities. In 2019, DHSS promulgated regulations that required businesses to obtain licenses before they could operate medical marijuana facilities. As a condition of applying for and maintaining such a license, businesses must prove they are majority-owned by persons who have been Missouri residents for at least one year. Mark Toigo, a Pennsylvania resident, is a minority owner in Organic Remedies MO, Inc. (ORMO), a licensed marijuana dispensary. He wishes to invest additional capital and become a majority owner in ORMO but cannot because of the durational residency requirement. He also wishes to either apply for a license to operate a medical marijuana facility or purchase an already-issued license for himself but cannot because of the same requirement. He argues the durational residency requirement violates the Constitution's dormant commerce clause in that it discriminates against out-of-state commerce without being narrowly tailored to advance a legitimate local purpose.

Toigo has moved for a preliminary injunction, Doc. 15, enjoining DHSS and its acting director Robert Knodell from enforcing the durational residency requirement pursuant to 42 U.S.C. § 1983. Toigo represents that if Defendants were enjoined from enforcing the durational residency requirement, he would apply for a medical marijuana license, personally invest additional capital into ORMO and solicit additional investment from out-of-state individuals, and attempt to purchase an already-issued license. Doc. 15-1 at 2-3 (Toigo Affidavit). For the reasons discussed below, Toigo's Motion is granted.

**I. Preliminary Injunction Standard**

In deciding whether to issue a preliminary injunction, the Court considers: (1) the likelihood that Plaintiff will prevail on the merits; (2) whether Plaintiff faces a threat of irreparable harm absent the injunction; (3) the balance between the harm Plaintiff faces and the injury that the injunction's issuance would inflict upon Defendants; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Preliminary injunctive relief is "an extraordinary remedy" and "the party seeking injunctive relief bears the burden of proving all the *Dataphase* factors." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

**II. Durational Residency Requirement**

Article XIV, § 1.7(3) of the Missouri Constitution states:

> All medical marijuana cultivation facility, medical marijuana dispensary facility, and medical marijuana-infused products manufacturing facility licenses, entities with medical marijuana testing facility certifications, and entities with transportation certifications shall be held by entities that are majority owned by natural persons who have been citizens of the state of Missouri for at least one year prior to the application for such license or certification. Notwithstanding the foregoing, entities outside the state of Missouri may own a minority stake in such entities.

§ 1.7(3). An entity is defined as a "natural person", corporation, "or any other legal entity." § 1.2(3). The term "citizen" is not defined.

In 2019, DHSS issued regulations governing the medical marijuana industry authorized by Article XIV of the Missouri Constitution. 19 C.S.R. 30-95.040(3)(B) provides:

> Cultivation, infused products manufacturing, dispensary, testing, and transportation facilities shall be held by entities that are majority owned by natural persons who have been citizens of the state of Missouri for at least one (1) year prior to applying for a facility license or certification. For the purposes of this requirement, citizen means resident.

To apply for a license, a facility must submit documents showing "the applicant is majority owned by Missouri residents" and submit proof of residency showing they have resided in Missouri for at least one year and do not claim resident privileges in another state. 19 C.S.R. 30-95.025(4)(A)(2); 19 C.S.R. 30-95.040(2)(C). In addition, a licensed facility must request and be granted approval from DHSS anytime it makes "any changes to ten percent . . . or more of the ownership interests of the facility. Its request must include:

> B. An updated Ownership Structure Form, included herein, which must show the applicant entity is majority owned by Missouri residents, and a written description or visual representation of the facility's ownership structure including all entities listed on the Ownership Structure Form; [and]
> C. For each owner claiming Missouri residency for purposes of subparagraph B of this paragraph, a statement that the owner has resided in Missouri for at least one (1) year and does not claim resident privileges in another state or country, as well as proof of current Missouri residency, which shall be shown by--
> (I) A copy of a valid Missouri driver's license, a Missouri Identification Card, a current Missouri motor vehicle registration, or a recent Missouri utility bill; or
> (II) If none of these proofs are available, some other evidence of residence in Missouri, which shall be approved or denied at the discretion of the director of the medical marijuana program as sufficient proof of residency[.]

19 C.S.R. 30-95.040 (4)(C)(2)(B)-(C); *see also* 19 C.S.R. 30-95.040(D).

**III. Discussion**

**A. Standing**

As a threshold matter, DHSS characterizes Toigo's Complaint as "primarily [alleging] a claim of injury derivative of injuries to [ORMO], a corporation in which Plaintiff is a minority

shareholder." The State asks the Court to disregard any harms suffered by ORMO in evaluating this Motion, since Toigo cannot prosecute a claim on behalf of ORMO under the Shareholder Standing Rule. *See Potthoff v. Morin*, 245 F.3d 710, 716 (8th Cir. 2001) ("[A]ctions to enforce corporate rights or redress injuries to the corporation cannot be maintained by a stockholder in his own name even though the injury to the corporation may incidentally result in the depreciation or destruction of the values of the stock."). (internal citations omitted).

Toigo does not dispute DHSS's application of the Shareholder Standing Rule but points out that "Defendants do not challenge Mr. Toigo's standing to challenge the state's durational residency requirement as an individual applicant" or as an out-of-state resident who wishes to enter the medical marijuana market in Missouri.

For purposes of evaluating this Motion, the Court accepts that Toigo cannot advance claims on behalf of ORMO and will disregard any alleged injuries suffered by ORMO. Toigo has alleged irreparable injuries in that he himself will be unable to apply for a medical marijuana license or increase his ownership share in medical marijuana businesses in Missouri due to the durational residency requirement. These injuries are not derivative of his minority interest in ORMO and thus are not excluded from consideration under the Shareholder Standing Rule.

**B. Likelihood of Success on the Merits**

The Commerce Clause empowers Congress "[t]o regulate commerce . . . among the Several States." U.S. Const. art. 1, § 8, cl. 3; *see also Dep't of Re venue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). The dormant commerce clause is the negative implication of the Commerce Clause: It prohibits states from enacting laws "that discriminate or unduly burden interstate commerce." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003) (citing *Quill Corp. v. North Dakota*, 504 U.S. 298, 312 (1992)). State laws violate the dormant commerce clause

if they require differential treatment of in-state and out-of-state economic actors that benefits the former and burdens the latter unless the regulation is narrowly tailored to advance a legitimate local interest. *Oregon Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 999 (1994). Courts have applied the dormant commerce clause to marijuana facilities regulated by states that have legalized or partially legalized the drug despite the fact that it remains a controlled substance under federal law. *See NPG, LLC v. City of Portland, Maine*, 2020 WL 4741913 (D. Me. Mar 3, 2020); *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984) (holding the Controlled Substances Act did not grant states the power to burden interstate commerce in substances regulated under the Act).

A state law challenged on dormant commerce clause grounds is subject to a two-step analysis. *Hazeltine*, 340 F.3d at 593. First, the court considers whether the challenged law in fact discriminates against out-of-state economic interests in favor of in-state economic interests. *Id.* A law is considered facially discriminatory when it discriminates against out-of-state interests by its plain terms. *See Chem. Waste Mgm't, Inc. v. Hunt*, 504 U.S. 334, 342 (1992) (characterizing as facially discriminatory an Alabama law that assessed a surcharge for disposal of hazardous waste that was generated outside of state). A law may also be considered discriminatory if it has a discriminatory purpose or a discriminatory effect, even if it is neutral on its face. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (discriminatory purpose); *Maine v. Taylor*, 477 U.S. 131, 148 n. 19 (1986) (discriminatory effect). If the challenged law is found to be discriminatory it is *per se* invalid, and the court moves to the second step of its analysis where it considers whether the state can show that "it is narrowly tailored to advance a legitimate local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019) (internal quotations omitted); *see also South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (quoting

*Granholm v. Heald*, 544 U.S. 460, 476 (2005)) ("State laws that discriminate against interstate commerce face a 'virtually per se rule of invalidity.")

It is not necessary to look beyond the face of the State's durational residency requirement to determine whether it is discriminatory. A law that prevents persons from becoming majority shareholders in Missouri businesses that engage in the cultivation, manufacture, and dispensation of medical marijuana products unless they have lived in Missouri for one year and do not reside in any other state is facially discriminatory against out-of-state economic interests. A law that prevents out-of-state persons from applying for medical marijuana licenses or purchasing them from others is also facially discriminatory against out-of-state economic interests. DHSS in its briefing does not dispute the facially discriminatory nature of the durational residency requirement, which categorically forecloses non-Missouri residents from owning a majority interest in any medical marijuana facility in Missouri.

To survive the resulting presumption of invalidity, *Granholm*, 544 U.S. at 476, DHSS must show the law advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. *Davis*, 553 U.S. at 338 (internal citations committed). These justifications must survive strict scrutiny. *Oregon Waste Sys., Inc.*, 511 U.S. at 101. DHSS proffers two virtually interchangeable justifications for the residency requirement: that it is required to enforce drug laws and that it is required to prevent the illicit diversion of medical marijuana for recreational or out-of-state use. Doc. 21, at 16 (DHSS Sugg. in Opp.).

The recreational use of marijuana remains illegal under Missouri and federal law. In an affidavit, Michael Boger, the administrator of DHSS's Bureau of Narcotics and Dangerous Drugs, has stated that it is a State priority to prevent the marijuana grown for medicinal purposes from being used recreationally or diverted to other states. Doc. 21-3 at 2 (Boger Affidavit). Boger

represents that "The ability to conduct thorough background checks plays an important role in preventing revenue from medical marijuana from being diverted to criminal enterprises, gangs, cartels, and black-market areas." *Id.* at 3-4. He states "It is faster and easier to do a thorough background check if an applicant is a Missouri resident because pertinent records are in Missouri and Missouri licensing authorities have access to those records . . . It is easier to obtain Missouri corporate records on file, filings, tax information, and criminal histories than to obtain such records from other states." *Id.* at 4. He states "Missouri state agencies do not always have authority to obtain confidential records from agencies in different states. Sometimes additional waivers or releases have to be obtained and reviewed by legal counsel." *Id.* Essentially, DHSS argues it is necessary to enforce a durational residency requirement because it is "faster and easier" to conduct thorough background checks of Missouri residents which are necessary to ensure that licenses are not being issued to individuals or companies who might divert medicinal marijuana to recreational or out-of-state uses. DHSS casts the residency requirement as "narrowly drawn" to protect its interest in enforcing drug laws and preventing medical marijuana from leaving the State.

Although the State has a legitimate interest in enforcing laws concerning controlled substances (including those laws that prevent medical marijuana from being used recreationally or outside its borders), Supreme Court precedent makes clear that categorical durational residency requirements are not narrowly tailored to advance that interest. In *Tennessee Wine*, the Supreme Court considered a Tennessee liquor law that places "onerous durational-residency requirements for all persons and companies wishing to operate 'retail package stores' that sell alcoholic beverages for off-premises consumption." 139 S. Ct. at 2457. Tennessee's durational residency requirement required individuals applying for such a liquor license to demonstrate they had been Tennesseans for at least two years. *Id.* It similarly required corporations applying for a license to

demonstrate that all officers, directors, and owners had been state residents for at least two years. *Id.* The Tennessee Wine and Spirits Retailers Association, defending the state law, argued the durational residency requirement was necessary so that the State could "determine an applicant's fitness to sell alcohol" and guard against "undesirable" non-residents from "moving into the State for the purpose of operating a liquor store." *Id.* at 2475.

The Supreme Court rejected the Association's justification. It held that "The State can thoroughly investigate applicants without requiring them to reside in the State for two years before obtaining a license" through normal criminal background checks or "more searching checks" if necessary. *See also Cooper v. McBeath*, 11 F.3d 547, 554 (5th Cir. 1994) ("If Texas desires to scrutinize its applicants thoroughly, as is its right, it can devise nondiscriminatory means short of saddling applicants with the 'burden' of residing in Texas."). The Supreme Court was dubious that a residency requirement actually served the law enforcement purpose proffered by the Association. *Tennessee Wine*, 139 S. Ct. at 2475 ("[A]ll that the 2-year requirement demands is residency. A prospective applicant is not obligated during that time to be educated about liquor sales, submit to inspections, or report to the State.") (internal quotations omitted). Finally, the Court pointed out that it had already rejected durational residency requirement for liquor sales in Michigan justified on the grounds of "protecting public health and safety" and "ensuring regulatory accountability" due to "improvements in technology" that have "eased the burden of monitoring out-of-state wineries." *Granholm v. Heald*, 554 U.S. 460, 492 (2005) ("Background checks can be done electronically. Financial records and sales data can be mailed, faxed, or submitted via e-mail."). DHSS does not cite to any instance where a court has upheld as constitutional a durational residency requirement on the grounds that it ensured thorough and easier-to-conduct backgrounds checks of business license applicants.

DHSS has proffered a justification that hinges on the idea that it can only investigate the backgrounds of individuals who have lived in Missouri for at least a year. But there is little reason to think that a one-year durational residency requirement would actually ease DHSS's burden in this regard. An applicant could rack up an extensive criminal history and record of financial misdeeds in Kansas, move to Missouri, and one year and one day later apply for a license to operate a medical marijuana facility. It is unexplained how the durational residency requirement would aid DHSS in uncovering this applicant's presumed ineligibility in this circumstance—DHSS does not explain how the task of securing an applicant's out-of-state records would be eased by the simple fact that the applicant had lived in Missouri for the past year. It is also unclear why the State cannot simply require applicants to consent to a criminal background check and disclose their own records. In 2005, the Supreme Court held that monitoring out-of-state activities was not so burdensome a task that it justified a facially discriminatory restriction on out-of-state commerce "due to improving technologies." *Granholm*, 554 U.S. at 492. Sixteen years later, there is even less reason to think that DHSS lacks the technological means to advance its legitimate interest in enforcing its drug laws absent a durational residency requirement. *See Hazeltine*, 340 F.3d at 593 (state must demonstrate it has "no other means to advance a legitimate local interest.").

As to the State's argument that its durational residency requirement is necessary to prevent the illicit diversion of medical marijuana, the Court again acknowledges its legitimate interest in enforcing its drug laws in this regard. However, there are multiple nondiscriminatory means of advancing that interest, many of which the State has already implemented. DHSS currently tracks marijuana seed-to-sale, requires constant video surveillance of all medical marijuana facilities, has given itself a broad right of access to these business's records, and conducts criminal background checks of all facility owners and employees in the industry. *See* 19 C.S.R. 30-95.090 (Seed-to-

Sale Tracking), 30-95.040(2)(F) (background checks), 30-950.070, 30-95.100(2)(D) (video monitoring), *et seq*. DHSS cannot demonstrate that its durational residency requirement is necessary to advance its interest in this regard given the extensive and nondiscriminatory regulations already in place. Furthermore, it is far from clear how a durational residency requirement actually hinders the diversion of medical marijuana away from its intended purpose. It is no easier for a person who has lived in Missouri for less than a year to drive from Missouri to Kansas with medical marijuana in their trunk than it is for a person who has lived in Missouri for a year and a day. And it is no more difficult for a long-time Missouri resident to smuggle marijuana out of the medical system and into the recreational market than it is for anyone else. In this way, the durational residency requirement is not narrowly drawn to advance a legitimate local interest.

DHSS's justification for its durational residency requirement is virtually identical to the justifications offered by the Association in *Tennessee Wine* and Michigan in *Granholm*. In both cases, the Supreme Court held unconstitutional facially discriminatory durational residency requirements grounded in the State's interest in being able to thoroughly assess the background of out-of-state business license applicants. At its core, their cases are grounded in the police power—their inherent authority to enforce the criminal laws and prevent crime. The Supreme Court has been clear that invocation of the police power alone is not enough to overcome the dormant commerce clause. *See Tenn. Wine*, 139 S. Ct. at 2468 ("[T]he commerce clause did not permit the States to impose protectionist measures clothed as police-power regulations."). At this preliminary stage, the State has not demonstrated that the durational residency requirement is narrowly tailored to advance its legitimate interest in crime prevention, much less that it has "no other means" to advance that interest. *Hazeltine*, 340 F.3d at 593. Because Toigo has shown a strong likelihood of success on the merits of his claim, this factor weighs in his favor.

**b. Irreparable Harm**

Toigo argues there is a threat of irreparable harmed if a preliminary injunction is not entered because (1) the durational residency requirement is depriving him of a constitutional right; and (2) his economic injuries cannot be compensated through an award of damages. Toigo, citing to *Elrod v. Burns,* 427 U.S. 347 (1976), asserts that the loss or deprivation of a constitutional right automatically constitutes irreparable harm warranting injunctive relief. *Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (internal citations omitted). However, under Eighth Circuit precedent *Elrod* does not apply "where no First Amendment interests are imperiled." *See Reproductive Health Serv. of Planned Parenthood of the St. Louis Region*, *Inc. v. Nixon*, 428 F.3d 1139, 1143 (8th Cir. 2005). In non-First Amendment contexts, a movant must demonstrate not only a constitutional violation but that the irreparable harm is certain and "of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not enough. *Roberts v. Van Burden Pub. Sch.*, 731 F.2d 523, 526 (8th Cir. 1984) (internal citations omitted). Finally, in cases where damage claims are barred by the Eleventh Amendment, irreparable harm is presumed so long as the injury itself is not speculative. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). In this case, because all sides agree that claims for monetary damages against the State are barred under the Eleventh Amendment, equitable relief in the form of an injunction is all that remains available for Toigo.

The State claims that Toigo is not faced with imminent harm because even if he were eligible to apply for a medical marijuana license, he has little prospect of receiving one since DHSS has no plans to issue more licenses "any time soon." The State reasons that given the uncertainty surrounding when DHSS will issue new licenses and whether Toigo would receive a newly issued

license even if he were eligible to apply for one, the alleged harm that could result from him being ineligible to apply for such a license is speculative. As to Toigo's desire to become a majority shareholder in ORMO, the State argues this alleged harm is speculative because he has "presented no evidence that other shareholders are willing to transfer any of their shares to him" and "does not assert that he wishes to buy an interest in any medical marijuana facility in Missouri whose license is not held by ORMO[.]" Toigo has stated that if the durational residency requirement were not in effect, he would apply for and/or purchase a medical marijuana license and personally invest in and raise additional capital for ORMO. Doc. 15-1 at 2-3 (Toigo Affidavit).

The State's argument on this point is unpersuasive. It may be true that any given Missouri resident has slim odds of receiving a license to operate a medical marijuana facility "any time soon" because the licenses are not currently being issued and because the number of applications has so far well exceeded the number of available licenses. Yet the fact remains that Toigo's odds of receiving a license are nil so long as he does not reside in Missouri. His chances of ever being able to invest the amount of capital he wishes to invest in ORMO, acquire a controlling stake in ORMO, or acquire a controlling stake in another medical marijuana business in Missouri are similarly nil. If and when DHSS issues new licenses, Toigo's harm will be not speculative but guaranteed in that unlike Missouri residents, he will have no ability to apply for a license and thus no chance of receiving one. The harm resulting from Toigo's inability to purchase an already-issued license or invest in already-licensed businesses (including the business he already partially owns) is immediate and ongoing.

DHSS relies on the fact that Toigo has not applied for a license or arranged to purchase or additionally invest in a medical marijuana concern in Missouri to support its argument that Toigo's harm is speculative. But Toigo cannot fairly be expected to take these actions when he is

categorically barred from doing so by the same durational residency requirement that DHSS enforces. Absent an injunction preventing the enforcement of the durational residency requirement, Toigo's injury from being excluded from full participation in Missouri's medical marijuana industry will be irreparable since money damages are unavailable. Because Toigo has established that he is likely to suffer irreparable harm if a preliminary injunction is not entered, this factor weighs in his favor.

**c. Balance of Harms**

Toigo argues the balance of harms tilts in his favor because the durational residency requirement prevents him "from directly or more fully participating in Missouri's medical marijuana marketplace and hinders him from investing more in ORMO or from obtaining additional investors from out-of-state." On the other side, he argues Missouri cannot be harmed by an injunction that prevents it from enforcing an unconstitutional law. *See Little Rock Family Planning Services v. Rutledge*, 397 F.Supp.3d 1213, 1322 (E.D. Ark 2019) ("[A] State has no interest in enforcing laws that are unconstitutional . . . an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State.") (citing *Hispanic Interest Coal. Of Ala. v. Governor of Alabama*, 691 F.3d 1236, 1249 (11th Cir. 2012)). The State argues that it will be irreparably harmed if it is enjoined from enforcing its drug laws. For reasons explained above, the Court has determined that the durational residency requirement is likely unconstitutional under the dormant commerce clause. DHSS cannot be irreparably harmed by an inability to enforce an unconstitutional law. *See Little Rock*, 397 F.Supp.3d at 1322; *see also Pavek v. Simon*, 467 F.Supp.3d 718, 762 (D. Minn. 2020). Because the harm inflicted on Toigo if an injunction is not issued outweighs the harm inflicted on DHSS if an injunction is issued, this factor tilts in Toigo's favor.

**d. Public Interest**

Finally, Toigo argues a preliminary injunction would serve the public interest "because it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds in Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc). The State responds that the public "has an interest in effective law enforcement, prevention of drug trafficking and criminal enterprise or gang involvement in the controlled substance market, and public safety that weigh in favor of denying a preliminary injunction." The public's interest in preventing criminal activity and ensuring public safety cannot justify the violation of Toigo's constitutional rights to engage in interstate commerce when non-discriminatory means exist to advance those same interests. The public interest is best served by the protection of Toigo's constitutional right to fully participate in the medical marijuana business in Missouri on the same footing as a Missouri resident, a right that is likely being violated by the State's durational residency requirement. *Phelps*-Roper, 545 F.3d at 690. The public interest weighs in favor of a preliminary injunction.

**4. Conclusion**

For the reasons explained above, each of the *Dataphase* factors militates in favor of a preliminary injunction. As such, Toigo has met his burden in establishing the basis for a preliminary injunction. *Dataphase*, 640 F.2d at 114. Toigo's Motion for Preliminary Injunction is granted. Defendants are preliminarily enjoined from enforcing the durational residency requirement in Article XIV, § 1.7(3) of the Missouri Constitution and as promulgated in 19 C.S.R. 30-95.025 and 19 C.S.R. 30-95.040. Pursuant to Fed. R. Civ. P. 65(c), Toigo is ordered to post a bond in the amount of $10,000 to pay the costs and damages sustained by Defendants if it is later found they have been wrongfully enjoined.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: June 21, 2021
Jefferson City, Missouri